# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

In re                    )

FRANKLIN SOUTHERN      )   Case No.: 3:23-bk-00938
MANUFACTURING, LLC,

                     )   Chapter 11

       Debtor.        )

_____ )

## APPLICATION FOR PAYMENT OF
### POST-PETITION ADMINISTRATIVE RENT

EastGroup Properties, L.P. ("Landlord"), a creditor, moves the Court pursuant to 11 U.S.C. §§ 356(d)(3), 503(b) and Local Rule 3071-1, for an order allowing and directing the immediate payment of Landlord's administrative rent claim in the amount of $282,749.31 for unpaid post-petition rent and other sums due under a lease agreement between All Florida Safety Institute, LLC (the "Debtor") and Landlord, and in support of the application states:

1.     On April 27, 2023 (the "Petition Date"), Debtor filed a voluntary petition for protection under Chapter 11 of the United States Bankruptcy Code.

2.     Landlord owns the commercial real property located at 8500 Baycenter Road, Suite 2, Jacksonville, Florida 32256 (the "Property"), more particularly described as:

SEC 56 TWN 3S RANGE 27 E FRANCIS RICHARD GRANT
Parcel ID 152612-1000

3.      On May 27, 2022, Landlord executed a Lease Agreement (the "Lease") with Debtor to lease a portion of the Property, identified as Suite 2, consisting of approximately 75,664 square feet (the "Premises").  A copy of the Lease is attached as **Exhibit A**.

4.      Pursuant to the terms of the Lease, Debtor is required to make monthly rent payments of $71,730.63 to Landlord on the first day of each month.  The payment includes base rent of $8.15 per usable square foot and an operating expense of $1.75 per square foot as Debtor's pro rata share of the calendar year operating expenses, which covers common expenses such as property maintenance and repairs, insurance premiums, and property taxes.  Sales tax for the State of Florida, Duval County is also included in the payment and is currently set at 7%.

5.      Debtor defaulted under the terms of the Lease by failing to pay rent for May 2023, and each month thereafter.  The last rent payment Landlord received from Debtor was on April 19, 2023, prior to the Petition Date.

6.      Notwithstanding the non-payment of rent, Debtor remains in possession of the Property.  In so doing, Debtor has failed to comply with 11 U.S.C. § 365(d)(3) which requires a Trustee or debtor in possession to pay rent to Landlord for its post-petition occupancy of the non-residential real property:

> The trustee shall timely perform all obligations of the Debtor, except those specified in § 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding §503(b)(1) of this title. . . .

> 11 U.S.C § 365(d)(3)(A).

7.      As of this date, Debtor has neither assumed nor rejected the Lease.

8.      Section 503(b)(1)(A) of the Bankruptcy Code provides for the allowance of "the actual, necessary costs and expenses of preserving the estate . . .  after the commencement of the case."

9.      The rent associated with the Debtor's continued use and occupancy of the Property is an actual and necessary expense of preserving the bankruptcy estate.  The amount of the benefit of the estate is presumed to be the contract rate of rent unless there is evidence to the contrary.  *In re Beverage Canner Int'l Corp.*, 255 B.R. 89, 93 (Bankr. S.D. Fla. 2000).

10.     In total, Debtor owes Landlord $282,749.31 in unpaid post-petition rent which is calculated as follows[1]:

| | |
|---|---:|
| Rent Due for May 2023 | $51,388.47 |
| Additional Rent for May 2023 | $12,713.55 |
| Sales Tax on May 2023 Rent | $4473.49 |
| Rent Due for June 2023 | $53,469.23 |
| Additional Rent for June 2023 | $12,893.89 |
| Sales Tax on June 2023 Rent | $4,619.15 |
| Rent Due for July 2023 | $53,469.23 |
| Additional Rent for July 2023 | $13,372.52 |
| Sales Tax on July 2023 Rent | $4,619.15 |
| Rent Due for August 2023 | $53,469.23 |
| Additional Rent for August 2023 | $13,642.25 |
| Sales Tax on August 2023 Rent | $4,619.15 |
| **TOTAL** | **$282,749.31** |

11.     Landlord is therefore entitled to allowance and immediate payment of an administrative claim in the total amount of $282,749.31 for the post-petition rental charges due under the terms of the Lease.

---

[1] The Landlord's account of the amount of rent owed is attached as **Exhibit B**.

12.     Finally, Landlord is entitled to recover its reasonable attorneys' fees and costs as an administrative expense in connection with its post-petition efforts to requirement payment of administrative rent in this case:

> Where the trustee or debtor-in-possession fails to perform the primary obligation under the lease (i.e. to pay rent), and the landlord incurs legal fees seeking to obtain payment, it follows that the attorney's fees, if authorized under the lease and linked to enforcement of the payment obligation, are entitled to the same administrative priority as the rent obligation.
>
> *In re Beltway Med., Inc.,* 358 B.R. 448, 453 (Bankr. S.D. Fla. 2006).

13.     In this case, the Lease contains a provision permitting Landlord to recover its reasonable attorneys' fees and costs related to a breach of the Lease:

> In the event of any legal action or proceeding is brought by either party to enforce this Lease, the non-prevailing party shall pay all expenses of the prevailing party incurred in connection with such action or proceeding, including court costs and reasonable attorney's fees at or before the trial level and in any appellate or bankruptcy proceeding.
>
> EastGroup Properties, L.P. Lease Agreement. § 29(g).

14.     Landlord has incurred in excess of $2,500 in attorneys' fees in connection with this motion and enforcement of the Lease.

WHEREFORE, Landlord moves this Court for the entry of an order (i) allowing Landlord an administrative claim for all amounts coming due after the Petition Date, (ii) permitting Landlord to recover reasonable attorneys' fees and costs incurred in connection with compelling the payment of administrative rent, (iii) directing the Debtor to

immediately pay such administrative claim to Landlord, and (iv) granting such further relief as is appropriate.

**THAMES | MARKEY**

*/s/ Richard R. Thames*

By _____
        Richard R. Thames

Florida Bar No. 0718459
50 N. Laura Street, Suite 1600
Jacksonville, Florida 32202
(904) 358-4000
(904) 358-4001 Facsimile
rrt@thamesmarkey.law

Attorneys for EastGroup Properties, L.P.

**Certificate of Service**

I hereby certify on August 25, 2023 the foregoing pleading was transmitted to the Clerk of the Court for uploading to the Case Management/Electronic Case Filing System which will send a notice of filing to all parties who have consented to receiving electronic notices in this case.  Copies of the foregoing were also furnished by U.S. Mail, postage prepaid on August 25, 2023 to Franklin Southern Manufacturing, LLC, Attn: Billy Sermons, President and CEO,  8500 Baycenter Road, Suite 2, Jacksonville, Florida 32256 and to the Rule 1007(d) list of creditors and parties in interest listed on the mailing matrix attached hereto.

*/s/ Richard R. Thames*
_____
Attorney

Label Matrix for local noticing
113A-3
Case 3:23-bk-00938-JAB
Middle District of Florida
Jacksonville
Fri Aug 25 08:29:10 EDT 2023

American Express
P O Box 650448
Dallas, TX 75265-0448

Bluelinx
1950 Spectrum Circle Suite #300
Marietta, GA 30067-8472

Boise Cascade Bld. Mat. Dist.
4300 S. Enterprise St
Boise, ID 83705-5421

Boise Cascade Building Materials Distributio
c/o GEORGE L. ZINKLER, III
LORIUM LAW
101 Northeast Third Avenue, Suite 1800
Fort Lauderdale, FL 33301-1252

Cenvar Roofing
2124 Loudon Ave NW
Roanoke, VA 24017-6925

DHL
236 WENDELL H FORD BLVD MS 1305
Erlanger, KY 41018-1273

Epilay
21175 S Main St Suite C
Carson, CA 90745-1500

Flack Global Metals
600 TownPark Lane NW Ste. #L-1000
Kennesaw, GA 30144-3729

Florida Department of Revenue
P.O. Box 6668
Tallahassee, FL 32314-6668

Fora Financial Advance, LLC
519 Eighth Avenue 11th Floor
New York, NY 10018-4581

Fox Capital Group, Inc.
140 Broadway Floor 46
New York, NY 10005-1155

Huttig
555 Maryville University Drive
Saint Louis, MO 63141-5805

Painted Metal Products
1025 Lockwood Dr,
Houston, TX 77020-7301

Primesource Building Products
1321 GREENWAY DR
Irving, TX 75038-2504

Reibus
1 Glenlake Pkwy NE Suite #300
Atlanta, GA 30328-3450

Robetex
2504 Fayetteville Rd,
Lumberton, NC 28358-3114

Robetex, Inc.
c/o Richard R. Thames, Esq.
50 North Laura Street, Suite 1600
Jacksonville, Florida 32202-3614

(c)SHANDEX CORP
400 KELBY ST STE 1802
FORT LEE NJ  07024-2952

Skymark Roofing, LLC
P.O. BOX 1232
Mount Dora, FL 32756-1232

Skymark Roofing, LLC
c/o Scott S. Sheffler, Esq.
Worman & Sheffler, P.A.
2600 Lake Lucien Drive, Suite 405
Maitland, FL 32751-7232

Starwrap Inc.
7324 Southwest Fwy  Suite #1440
Houston, TX 77074-2173

TQL
12724 Gran Bay Pkwy  Suite #250
Jacksonville, FL 32258-9486

The Henry Company
2701 State Rd 60 W
Bartow, FL 33830-8750

Addresses marked (c) above for the following entity/entities were corrected
as required by the USPS Locatable Address Conversion System (LACS).

Shandex Corp
400 Kelby St. 17th Floor
Fort Lee, NJ 07024

End of Label Matrix
Mailable recipients    23
Bypassed recipients     0
Total                  23

# Exhibit "A"

DocuSign Envelope ID: 4B4400B8-7605-4954-B07A-1E65A3277AE8

## LEASE AGREEMENT

THIS LEASE AGREEMENT ("Lease") is made and entered into as of **5/27/2022** _____, 2022, by and between **EastGroup Properties, L.P., a Delaware limited partnership** ("Landlord") and **Franklin Southern Manufacturing LLC, a Florida limited liability company** (Tenant").

WITNESSETH:

1.    Premises. Landlord, in consideration of the payments to it by Tenant of the rents herein contained, which Tenant agrees to pay, and in consideration of the performance by Tenant of the covenants hereinafter provided, which Tenant agrees to fully and promptly perform, does hereby lease to Tenant approximately 75,664 rentable square feet (the "Premises") as shown on the plan attached hereto as "Exhibit A" and incorporated herein by reference, located within Building 1 (the "Building") of Deerwood Distribution Center (the "Center"). The address of the Premises is 8500 Baycenter Rd, Suite 2 Jacksonville, FL 32256. For purposes of calculating sums owed under this Lease, it is agreed that the Premises constitutes approximately 59.96% of the total leasable area within ☒ the Building, or ☐ the Center in which it is located. Said percentage is hereinafter referred to as "Tenant's Share." If the size of the Premises, or Building/Center is for any reason adjusted, Tenant's Share shall be likewise adjusted accordingly.

    Provided Landlord is in receipt of a fully executed copy of this Lease, a copy of Tenant's certificate of insurance, and payment of the first (1ˢᵗ) month's rent, Landlord shall permit Tenant access to the Premises beginning on the date of this Lease and continuing until the Commencement Date (the "Early Access Period"), for the limited purpose of installing furniture, racking, and equipment and other personal property of Tenant (but only to the extent permitted by all applicable laws, statutes, codes and ordinances of all governmental entities with jurisdiction over the Center) (the "Early Access Activities"). Tenant's contractors shall work in harmony and not interfere with Landlord and Landlord's contractors, Landlord's work in other premises and in the common areas, or the general operation of the Building. If at any time such entry shall cause or threaten to cause disharmony or interference, including labor disharmony, Landlord may withdraw Tenant's right of entry upon written notice to Tenant. Notwithstanding the foregoing, (i) Tenant's entry to the Premises before the Commencement Date shall be subject to the terms, provisions and conditions of the Lease Agreement; provided, however, that except for the cost of services requested by Tenant, Tenant shall not be required to pay Rent (as defined in Section 3) for the Premises for any days of possession before the Commencement Date during which Tenant is in possession of the Premises for the sole purpose of the Early Access Activities; and (ii) Tenant will coordinate all Early Access Activities with Landlord

2.    Term. The term of the Lease shall be for a period of sixty (60) months beginning June 1, 2022 (the "Commencement Date") and ending on May 31, 2027 (such period being hereinafter referred to as the "Term").

3.    Rent. As "Rent" for the use and occupancy of the Premises, Tenant shall pay to Landlord, without demand, deduction or offset, as an independent covenant of all other covenants of this Lease, in lawful money of The United States of America, "Base Rent" as set forth in subparagraph (b) below, Tenant's Share of "Operating Expenses" (based on an initial estimated annual Operating Expense Factor of $1.75 as described in Section 6 below, and State of Florida sales tax ("Sales Tax") on all amounts due from Tenant to Landlord pursuant to this Lease. Such sums shall be payable in monthly installments in advance on the first day of each and every month of the Term as set forth below.

    With respect to rents, the parties also agree as follows:

    (a)    Tenant has deposited with Landlord simultaneously with Tenant's execution of this Lease, the sum of $62,422.80 plus all applicable Sales Tax for a total of $66,792.40 which will be credited to Tenant for payment of the second month's Rent.

    (b)    Rent Schedule: Base Rent shall be payable through the initial Term in accordance with the following schedule:

| Lease Period | SF | Base Rent Per SF* | Monthly Base Rent* |
|---|---|---|---|
| 6/1/22 - 5/31/23 | 75,664 | $8.15, | $51,388.47 |

DocuSign Envelope ID: 4B4400B8-7605-4954-B07A-1E65A3277AE8

| 6/1/23 - 5/31/24 | 75,664 | $8.48 | $53,469.23 |
| 6/1/24 - 5/31/25 | 75,664 | $8.82 | $55,613.04 |
| 6/1/25 - 5/31/26 | 75,664 | $9.17 | $57,819.91 |
| 6/1/26 - 5/31/27 | 75,664 | $9.53 | $60,089.83 |

*Amounts do not include applicable Sales Tax and Operating Expenses to be paid by Tenant.*

(c)  If the Commencement Date occurs on a day other than the first day of a calendar month, the Rent for such initial fractional month shall be prorated based on the actual number of days in such month. Any excess from the initial payment of Rent made by Tenant shall be applied to Rent due for the third month of the Term.

(d)  Rent shall be delivered by Tenant to Landlord at such place as Landlord may designate in writing and Rent shall be payable to *EastGroup Properties LP, East Coast Lock Box, P.O. Box 534563, Atlanta, GA 30353-4563*

(e)  Tenant hereby agrees with Landlord that in the event that Rent is received after the fifth (5ᵗʰ) day of the month in which it is due, Tenant shall pay to Landlord a late charge equal to five percent (5%) of the total sum due.

4.   Additional Rent.  In addition to Rent set forth herein, all other payments (if any) to be made by Tenant to Landlord shall be deemed to be and shall become additional rent hereunder, whether or not the same be designated as such; and shall be due and payable with the next succeeding installment of monthly Rent, together with Sales Tax thereon. Landlord shall have the same remedies for failure to pay the same as for a nonpayment of Rent. Following any returned check or other demand for payment, Tenant must remit all payments thereafter either by Wire Transfer or Bank Official Check only. An administrative fee will be assessed for all dishonored checks.

5.   Security Deposit.  Tenant shall, upon the execution of this Lease, deposit with Landlord as security for the payment of Rent and the performance of all other covenants to be performed by Tenant, the sum of $41,914.06. Said security deposit shall be noninterest bearing and shall be held by Landlord for the entire Term. If Tenant defaults in the payment of any monthly Rent installment or fails to perform any other covenant within ten (10) days after receipt of written demand therefor, Landlord, at its option, may apply sufficient sums from the security deposit towards payment thereof. If Landlord elects to so apply the security deposit, or any part thereof, Tenant shall be obliged to immediately replenish the security deposit for the amount so applied by Landlord. The total security deposit shall be held by Landlord until expiration of the Term, and the unused portion of the security deposit not having been drawn against shall be refunded by Landlord to Tenant after the end of the Term; provided, however, Landlord may retain all or any portion of the deposit as Landlord deems reasonably necessary as security for the payment of the final year-end Operating Expense reconciliation. The security deposit shall not be applied to Rent.

6.   Operating Expenses.  (a)  Initially, the estimated "Operating Expense Factor" equals $1.75 per square foot of the Premises for the calendar year in which the Commencement Date occurs, to cover Tenant's Share of the projected Operating Expenses.

With respect to Operating Expenses, the parties agree to the following:

(i)  The term "Operating Expenses" used in this Lease shall mean the total annualized cost of operating the Building/Center including, but not limited to, owner's association costs and assessments, Common Maintenance and Service Costs, Real Estate Taxes and Assessments, Insurance Premiums, accounting, management fees and other reasonable costs associated with the management and operation of the Building/Center. Said term shall not include depreciation on any improvement, any capital expenses or improvements except all net expenses properly allocable for any capital improvement incurred to reduce or limit increases in Operating Expenses, or required by any change in the laws, rules, regulations or orders of any governmental or quasi-governmental authority having jurisdiction, which expenses shall be repaid in equal monthly installments together with interest at applicable rates over the useful capital life of the capital improvement not to exceed ten (10) years, moving or relocation costs and real estate commissions.

(ii)  The term "Common Maintenance and Service Costs" shall include without limitation routine cleaning and maintenance of the exterior of the Premises to include periodic window cleaning; the cleaning, maintenance and

DocuSign Envelope ID: 4B4400B8-7605-4954-B07A-1E65A3277AE8

sweeping of the parking lot and sidewalks; the care and maintenance of the landscaping and landscaped areas to include the retention pond areas, conduits, pumps and irrigation systems; common area lighting and other utility charges, if any, domestic and irrigation water, and sanitary sewer charges and assessments; rubbish collection, if any; painting; and any other costs customarily considered as common repair, maintenance and service costs.

(iii)     The term "Real Estate Taxes and Assessments" shall include, without limitation, all ad valorem and non-ad valorem real and personal property taxes and assessments or any new and different taxes, and assessments levied against or assessed to the Building or Center.  All Sales Tax on Rent and personal property taxes charged or levied against Tenant's furniture, fixtures and equipment in the Premises shall be paid by Tenant when due.  Landlord shall have the right to employ a tax consultant to attempt to assure a fair tax burden on the Building or Center.  Tenant agrees to pay Tenant's Share of the cost of such consultant as a part of Operating Expenses.

(iv)     The term "Insurance Premiums" shall include, without limitation, the cost of Landlord's insurance as set forth in Section 9.  In the event the cost of premiums on said fire and extended insurance increases due to the hazardous nature of the use and occupancy by Tenant of the Premises, then the entire increase in insurance cost shall be paid by Tenant in a lump sum within thirty (30) days following receipt of invoice from Landlord.

(b)     From and after the Commencement Date until June 30, 2022, on a monthly basis, Tenant shall pay Landlord one-twelfth (1/12) of the Tenant's Share of estimated Operating Expenses for the Premises in advance, at the same time and in the same place as Base Rent.  From and after July 1, 2022, on a monthly basis, Tenant shall pay Landlord one-twelfth (1/12) of Tenant's Share of estimated Operating Expenses for the Premises in advance, at the same time and in the same place as Base Rent.  The Operating Expense Factor portion of the Rent set forth in Section 6(a) above (and, as a result, the Rent) shall be periodically adjusted to reflect Tenant's Share of actual or estimated decreases or increases in Operating Expenses.  Landlord shall provide the cost data upon which the determination of costs, and any decreases or increases therein, are based in a format it shall determine to be consistent with reasonable and customary business practices.  Landlord shall annually reconcile Tenant's annual Operating Expense payments for the preceding calendar year against Tenant's Share of the actual Operating Expenses for such calendar year.  In the event that Tenant's Share of actual Operating Expenses for such calendar year is less than the Operating Expense payments made by Tenant during such period, Landlord shall refund or credit such excess to the account of Tenant.  If the sum paid by Tenant is less than Tenant's Share of the actual Operating Expenses for such period, Tenant shall pay Landlord the difference upon invoice therefor accompanied by supporting data.  In no event shall Landlord's delay in the computation of such adjustment or the communication thereof to Tenant relieve Tenant of Tenant's obligation to pay monthly estimated Operating Expenses each month during the Term based upon the estimate then in effect.  The obligation to pay Tenant's Share of Operating Expenses incurred during the Term shall survive the expiration or termination of this Lease.

(c)     Tenant acknowledges that if the Building is part of a Center, the Center may include not only the Building but other buildings either already existing or to be constructed in the future.  Tenant understands and agrees that, for the purposes of administering the provisions of this Section 6, so long as the Building is owned and/or managed in conjunction with other buildings, Operating Expenses and other costs reimbursable by Tenant may be paid, recorded and reported on a consolidated overall project basis.

(d)     Upon computation of the Operating Expenses and the corresponding adjustment of the estimated monthly Operating Expense payments due from Tenant for the current lease year and the communication of that adjustment by Landlord to Tenant, Tenant shall pay, with the monthly installment of Base Rent next due following communication of such adjustment, the difference, if any, between the monthly estimated Operating Expenses for the preceding year and the monthly estimated Operating Expenses for the current year, multiplied by the number of months, if any, elapsed during the then current year prior to such communication (i.e. the number of months elapsed since the last anniversary of the Commencement Date).

7.     Construction.  Tenant accepts the Premises as follows:

Landlord to confirm and ensure all mechanical, plumbing, electrical, lighting systems, dock doors, and levelers, if applicable, are in good working order as of the Commencement Date.

With improvements to be constructed by the Tenant in accordance with Section 36 below.

DocuSign Envelope ID: 4B4400B8-7605-4954-B07A-1E65A3277AE8

Tenant acknowledges that neither Landlord nor its agents or employees have made any representations or warranties as to the suitability or fitness of the Premises for the conduct of Tenant's business or for any other purpose, nor has Landlord or its agents or employees agreed to undertake any alterations or construct any tenant improvements to the Premises except as expressly provided in this Lease. If for any reason Landlord cannot deliver possession of the Premises to Tenant on the Commencement Date, this Lease will not be void or voidable, and Landlord will not be liable to Tenant for any resultant loss or damage. Tenant shall be deemed to be accepting the Premises on an "As Is" basis, with no representation or warranties from Landlord of any kind except as expressly provided in this Lease.

8.      Utilities. Tenant shall pay when due electric power consumed at the Premises, which shall be separately metered. Tenant shall reimburse Landlord for water and sewer charges as part of the "Operating Expense Factor" pursuant to Section 6. Landlord reserves the right to install, at Landlord's discretion, separate meters (or submeters) for any utility, and may further require Tenant to place service in Tenant's name, whereupon Tenant shall pay any necessary deposits to the applicable utility company, and thereafter pay for such utilities directly. Tenant shall arrange and pay for trash collection services at the Premises.

In the event a tenant in the Building has a water intensive use, Landlord shall use commercially reasonable efforts to allocate water and sewer charges in an equitable manner.

9.      Insurance. (a)     Landlord shall, at all times during the Term of this Lease, insure the Building of which the Premises form a part against loss or damage to the Building/Center with coverage for perils as set forth under the "Causes of Loss-Special Form" or equivalent property insurance policy in an amount equal to the full insurable replacement cost of the Building/Center (excluding coverage of Tenant's personal property and any alterations by Tenant), and such other insurance, including liability and rent loss coverage, as Landlord may reasonably deem appropriate. Tenant shall procure and maintain throughout the Term of this Lease: (i) a commercial general liability insurance policy, including insurance against assumed or contractual liability under this Lease, for liability arising out of Tenant's operations in, and the use, occupancy or maintenance of, the Premises and all areas appurtenant thereto, including any portion of the common areas used by Tenant, to afford protection with respect to bodily injury, death or property damage (including loss of use) of not less than One Million Dollars ($1,000,000) each occurrence/Two Million Dollars ($2,000,000) general aggregate, and in the event property of Tenant's invitees or customers are kept in or about the Premises, warehouser's legal liability or bailee customers insurance for the full value of the property of such invitees or customers; (ii) an all-risks property and casualty insurance (special form building and personal property coverage) policy, including theft coverage, written at replacement cost value with replacement cost endorsements, covering all of the Tenant's property; (iii) a worker's compensation insurance policy with applicable statutory limits, including a waiver of subrogation in favor of Landlord, (iv) automobile liability insurance with single limit coverage of at least $1,000,000 for all owned, leased/hired or non-owned vehicles, (v) an excess/umbrella liability policy "following form" of not less than Two Million Dollars ($2,000,000), including a "drop down" feature in case the limits of the primary policy are exhausted, and (vi) in the event Tenant will generate, handle or store Hazardous Materials (as defined in Section 32 below) at the Premises, pollution legal liability insurance of not less than One Million Dollars ($1,000,000). All such policies shall be occurrence based and shall provide primary/ non-contributory coverage to Landlord (any policy issued to Landlord providing duplicate or similar coverage shall be deemed excess over Tenant's policies) and shall be procured by Tenant from responsible insurance companies satisfactory to Landlord that are rated no less than A-, Class VII, by A.M. Best Company. All commercial general liability, automobile liability and, if applicable, warehouser's legal liability or bailee customers insurance policies shall include an "Additional Insured Endorsement" and a "Waiver of Subrogation Endorsement" in favor of Landlord, its affiliated companies, as well as the employees, officers, directors and agents of such companies and any other designees of Landlord. The limits and types of insurance maintained by Tenant shall not limit Tenant's liability under this Lease. Landlord may also require all contractors performing work at the Premises for Tenant to provide in addition to the insurance coverages referenced above such other insurance in amounts and types and with such companies as may be reasonably requested by Landlord, including, without limitation, construction all risk/builder's risks (including loss of revenue) insurance, professional errors and omissions liability insurance, and insurance covering such contractor's equipment and tools. Certificates of insurance in a form reasonably satisfactory to Landlord, or certified copies of the policies, shall be furnished to Landlord or Landlord's designee in a manner designated by Landlord on or before the earlier of the Commencement Date or ten (10) days after execution of the Lease, reflecting the limits and endorsements required herein, and renewal certificates or certified copies of renewal policies shall be delivered to Landlord or its designee at least ten (10) days prior to the expiration date of any policy. Each policy shall require notice of nonrenewal to Landlord and shall further provide that it may not be altered or canceled without thirty (30) days prior notice to Landlord. Landlord agrees to cooperate with Tenant to the extent reasonably requested by Tenant to enable Tenant to obtain such insurance. Landlord shall have the right to require increased limits and/or specific

DocuSign Envelope ID: 4B4400B8-7605-4954-B07A-1E65A3277AE8

additional coverages if, in Landlord's reasonable judgment, either is necessary. If Tenant fails to comply with the foregoing requirements relating to insurance, Landlord may, following ten (10) days written notice to Tenant, obtain such insurance and Tenant shall pay to Landlord within thirty (30) days of receipt of invoice the premium cost thereof.

(b)    Notwithstanding any provision to the contrary contained herein, each party hereby releases any and every claim which arises or may arise in its favor and against the other party hereto and/or such party's agents, directors, officers, shareholders, partners, employees and affiliates during the Lease Term or any extension or renewal thereof for any and all injury, loss or damage to persons or property (regardless of whether such injury, loss or damage is the result of or caused by the negligent acts or omissions of the released party or any strict liability) arising from any cause that (i) would be insured against under the terms of any property or workers compensation insurance required to be carried hereunder; or (ii) is insured against under the terms of any property or workers compensation insurance actually carried, regardless of whether it is required hereunder; provided, however, such waiver by Landlord shall not be effective with respect to Tenant's liability described in Sections 13 and 32 below. This waiver and release is effective regardless of whether the releasing party actually maintains the insurance described above in this Section 9 and is not limited to the amount of insurance actually carried, or to the actual proceeds received after a loss. Each party shall have its insurance company that issues its property and/or workers compensation coverage waive any rights of subrogation and shall have the insurance company include an endorsement acknowledging this waiver, if necessary. Tenant assumes all risk of damage of Tenant's property within the Property, including any loss or damage caused by water leakage, fire, windstorm, explosion, theft, act of any other tenant, or other cause

10.    Use of Premises, Parking and Loading.  Tenant shall use and occupy the Premises only for use as administrative office, warehouse, distribution and manufacturing purposes and for no other purpose without Landlord's prior written consent.  Landlord hereby grants to Tenant, its employees, guests and invitees the non-exclusive right to use the offstreet auto parking lot and truck loading areas on the site upon which the Building is situated.  The auto parking lot shall be used by Tenant, its employees, guests and invitees, in common with other tenants of said Building, their employees, guests and invitees, and in common with Landlord and its employees, guests and invitees.  If Landlord designates a portion of the parking lot for tenant and employee parking, Tenant and employees of Tenant shall use that portion of the lot.  At all times in the absence of designated parking, Tenant, its employees and guests, shall use those parking areas closest to the Premises to the extent possible.  The exterior truck loading and trailer parking areas immediate to the Premises are reserved for the exclusive use of Tenant.  Tenant shall not use, block or otherwise interfere with the loading areas of other occupants in the Building or Center.  At no time will outside storage be permitted at the property without the express written consent of Landlord.

11.    Interruption of Utility Service.  Landlord does not warrant that any utilities or public services will be free from interruption or defect.  In the event of interruption of such services, the same shall not be deemed an eviction or disturbance of Tenant's use and possession of the Premises nor render Landlord liable to Tenant for damage by abatement of Rent or otherwise; provided, however, if any utility service to the Premises is interrupted for any period greater than three (3) consecutive business days due solely to Landlord's negligence or willful misconduct, and such interruption or failure prevents Tenant's use of the Premises for the purposes allowed by this Lease, then as liquidated damages for such interruption or failure, Rent payable hereunder shall be abated for each day after such three (3) business day period that such interruption or failure continues.

12.    Waiver of Claim; Indemnification.  Except to the extent caused by the gross negligence or willful misconduct of Landlord, its employees, agents or servants, Tenant waives and releases all claims against Landlord, its agents, employees, and servants, in respect of, and they shall not be liable for, injury or damage to persons or property sustained by Tenant or by any occupant of the Premises, the Building, or the Center or any other person occurring in or about the Building/Center or the Premises resulting directly or indirectly from any existing or future condition, defect, matter or thing in the Premises or the Building or any part of it, or from equipment or appurtenance therein, or from any accident, or from any occurrence, act, negligence or omission of any tenant or occupant of the Building, or of any other person.  The aforesaid waiver and release shall apply also to damage caused by flooding, sprinkling devices, air conditioning apparatus, water, frost, steam, excessive heat or cold, falling objects, broken glass, sewage, gas, odors or noise, or the bursting or leaking of pipes or plumbing fixtures and shall apply equally whether any such damage results from the act or circumstance, whether of a like or wholly different nature  If any damage to the Premises or to the Building or any equipment or appurtenance therein, or to Tenant thereof, results from any act or omission or negligence of Tenant, its agents, employees or invitees, Landlord, at Landlord's option, may repair such damage and Tenant shall, within ten (10) days following demand by Landlord, reimburse Landlord forthwith for all cost of such repairs and damages both to the Building and to tenants or occupants thereof, in excess of the amount, if any, paid to Landlord under insurance covering such damages.  All property in the Building or in the Premises belonging to Tenant, its agents, employees or invitees, or to any

DocuSign Envelope ID: 4B4400B8-7605-4954-B07A-1E65A3277AE8

occupant of the Premises, shall be there at the risk of Tenant or other person only, and Landlord shall not be liable for damage thereto or theft, misappropriation, or loss thereof. Tenant shall pay all loss or damage occasioned by or growing out of the use and occupancy of the Premises by Tenant, its agents, employees, guests, customers and invitees, and Tenant shall protect, defend and indemnify Landlord, its agents, directors, officers, shareholders, partners, employees and affiliates, and hold them harmless from any losses, liabilities, claims, damages, costs and expenses (including attorneys' fees), arising from the use and occupancy of the Premises or from any activity, work, or thing done, permitted or suffered by Tenant in or about the Premises or due to any other act or omission of Tenant, its subtenants, assignees, invitees, employees, contractors and agents. The furnishing of insurance required hereunder shall not be deemed to limit Tenant's obligations under this paragraph. Tenant's obligations pursuant to the foregoing indemnity shall survive the expiration or sooner termination of this Lease.

13.     Care of Premises.  (a)     Tenant shall take good care of the Premises and all fixtures, appurtenances, doors and windows, locks, walls, ceilings, flooring and mechanical and plumbing equipment located therein, excepting that which may be covered by applicable warranty, and, at its sole cost and expense, make all nonstructural repairs thereto and perform maintenance thereon as and when needed to preserve them in good working order and condition, reasonable wear and tear from use and damage from the elements, fire or other casualty excepted. Prior to Tenant taking occupancy, Landlord shall confirm these items are in good working order. Notwithstanding the foregoing, all damage or injury to the Premises or to any other part of the Building, or to its fixtures, equipment and appurtenances, whether requiring structural or nonstructural repairs, caused by or resulting from carelessness, omission, neglect or conduct of Tenant, its servants, employees, invitees or licensees, shall be repaired by Tenant at its sole expense to the satisfaction of Landlord reasonably exercised. Tenant shall replace or repair, as needed, all lamps, bulbs, ballasts and other lighting fixtures and apparatus. Tenant shall also repair all damage to the Building and the Premises caused by the moving of Tenant's fixtures, furniture or equipment. All the aforesaid repairs shall be of quality or class equal to the original work or construction. If Tenant fails after ten (10) days' notice to proceed with due diligence to make repairs required to be made by it, the same may be made by Landlord at the expense of Tenant. Tenant shall give Landlord prompt notice in writing of any defective condition in the Premises which Landlord is required to repair or replace. Landlord shall remedy the condition with due diligence but at the expense of Tenant if repairs are necessitated by damage or injury attributable to Tenant, Tenant's servants, agents, employees, invitees, or licensees as aforesaid. All repair work and/or modifications made to the Premises must be made by licensed and bonded contractor(s) approved by Landlord.

        (b)     As of the Commencement Date, the heating, ventilating and air conditioning system(s) ("HVAC") serving the Premises shall be in good working order. Thereafter, Tenant shall be responsible for the cost of all maintenance, repair and replacement thereof Tenant shall, within thirty (30) days of occupancy, contract with a licensed HVAC maintenance company approved by Landlord to maintain the system in proper working order with no less than three (3) quarterly inspections and maintenance services plus one (1) complete cleaning of coils and condensing units per year. Upon execution and renewal, Tenant agrees to supply a copy of the maintenance agreement to Landlord and shall at all times during the Term of the Lease keep in full force such HVAC maintenance agreement. If Tenant fails to enter into a maintenance agreement as herein provided or Landlord elects to provide same through its contractor, Landlord, at Landlord's option, may elect to enter into a service contract and Tenant shall pay the cost thereof. Provided Tenant complies with the requirements of this Section 13(b), and except to the extent caused by the acts or omissions of Tenant, its employees, agents or contractors, in the event any HVAC unit shall require repair or replacement, Landlord shall reimburse Tenant for any cost of such repair or replacement in excess of $1,000.00 per unit per occurrence. The cost of the regularly scheduled preventive maintenance/service contract and the cost of routine maintenance items such as filters and belts shall not be considered repair or replacement costs for purposes of determining Landlord's obligation to reimburse Tenant under this paragraph. In the event any HVAC unit requires repair or replacement that would trigger Landlord's reimbursement obligation as set forth in this paragraph, prior to performing such work Tenant shall give written notice to Landlord identifying such repair or replacement, and Landlord shall have the right to seek a second opinion from a contractor of Landlord's choosing as to the necessity of such repair or replacement. If Landlord's contractor disagrees with the necessity of the repair or replacement proposed by Tenant, Landlord's reimbursement obligation shall be based on the repair or replacement, if any, recommended by Landlord's contractor.

        (c)     Landlord agrees that during the Term it will keep the exterior and structural parts of the Building in good condition and repair, and that it will make such repairs promptly as they become necessary. If Tenant becomes aware of any condition that is Landlord's responsibility to repair, Tenant shall promptly notify Landlord in writing of the condition. Exterior parts of the Building shall be deemed to include exterior walls, foundations, pavement, roof replacement, gutters, downspouts, and plumbing which is a part of the structure or foundation. Landlord shall make such interior replacements as are necessitated by building equipment failure and repairs and replacements necessitated by fire or perils covered by extended coverage

DocuSign Envelope ID: 4B4400B8-7605-4954-B07A-1E65A3277AE8

insurance for which damage or loss insurance is carried by Landlord and for which insurance proceeds are recovered, including interior reconstruction and/or redecorating necessitated by such fire or other perils.

14.    Compliance with Laws and Regulations.

(a)    Tenant shall comply with all federal, state, county and city laws, ordinances, rules and regulations affecting or respecting the use or occupancy of the Premises by Tenant or the business at any time thereon transacted by Tenant, and Tenant shall comply with all rules which may be hereafter adopted by Landlord for the protection, welfare and orderly management of the Building and its tenants or occupants.

(b)    Patriot Act. Each party hereby represents, warrants and certifies that: (i) neither it nor its officers, directors, or controlling owners is acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order, the United States Department of Justice, or the United States Treasury Department as a terrorist, "Specifically Designated National or Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control ("SDN"); (ii) neither it nor its officers, directors or controlling owners is engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity, or nation; and (iii) neither it nor its officers, directors or controlling owners is in violation of Presidential Executive Order 13224, the USA PATRIOT Act, (Public Law 107-56), the Bank Secrecy Act, the Money Laundering Control Act or any regulations promulgated pursuant thereto. Each party hereby agrees to defend, indemnify and hold harmless the other party from and against any and all claims, damages, losses, risks, liabilities and expenses (including reasonable attorneys' fees and costs) arising from or related to any breach of the foregoing representations, warranties and certifications by the indemnifying party. The provisions of this paragraph shall survive the expiration or earlier termination of this Lease.

15    Holding Over. Tenant has no right to remain in possession of all or any part of the Premises after the expiration of the Term. If Tenant nevertheless remains in possession of all or any part of the Premises after the expiration of the Term, with or without the express or implied consent of Landlord: (a) such tenancy will be deemed to be a periodic tenancy at sufferance from day-to-day only, (b) such tenancy will not constitute a renewal or extension of this Lease for any further term; (c) Rent during such tenancy shall be an amount equal to 150% of the Rent for the last month of occupancy; and (d) such tenancy shall be subject to immediate termination by Landlord at any time. Any other sums due under this Lease will be payable in the amount and at the times specified in this Lease. In addition to such payment of Rent and other amounts as set forth in the previous sentence, Tenant shall also be liable to Landlord for any losses sustained by Landlord or claims by third parties arising out of and in connection with the holding over of the Premises by Tenant. Such day-to-day tenancy will be subject to every other term, condition, and covenant contained in this Lease, except for rights to renew and expand.

16.    Signs. Tenant shall not install or locate signs in the windows and doors of the Premises or any other part of the Building or grounds without first securing Landlord's written consent, which shall not be unreasonably withheld conditioned or delayed Any signs installed by Tenant with Landlord's permission shall be at the sole cost of Tenant and maintained by Tenant in good repair and shall be removed and any building or grounds damaged therefrom restored by Tenant at the expiration or earlier termination of this Lease at Tenant's expense.

17.    Quiet Enjoyment; Imposition of "Reasonableness" Standard. Tenant, upon paying the Rent and keeping and performing the covenants of this Lease to be performed by Tenant, shall peacefully and quietly hold, occupy, and enjoy the Premises from and after the Commencement Date, without any hindrance or molestation by Landlord or any persons lawfully claiming under Landlord. Wherever the consent or approval of either party is required herein, it is understood and agreed that such consent or approval may not, unless expressly stated otherwise in this Lease, be unreasonably withheld or delayed. If either party withholds any consent or approval, such party shall on written request deliver to the other party a written statement giving the reasons therefor. Tenant's sole remedy if Landlord unreasonably withholds or delays consent or approval shall be an action for specific performance, and Landlord shall not be liable for damages. Whenever this Lease specifies that either party has the right of consent, said consent shall be effective only if in writing and signed by the consenting party.

18.    Waste; Disturbance. Tenant shall not commit nor suffer any waste upon the Premises nor cause nor allow any nuisance, odor, noise, vibration or other act or thing which does or may disturb any other tenant in the Building/Center containing the Premises or any other building in the Center, including without limitation the parking, loading and landscaped areas. Tenant shall

7

DocuSign Envelope ID: 4B4400B8-7605-4954-B07A-1E65A3277AE8

conduct its business and control its employees, agents, contractors, invitees and visitors in such manner as not to create any nuisance, or interfere with, annoy or disturb any other tenant or Landlord or the operation of the Building.

19.  **Assignment and Subletting.** Tenant shall not assign this Lease nor sublet all or any part of the Premises, except to a parent company, subsidiary or affiliated entity of common ownership and business ("Affiliate"), without first securing Landlord's written consent, which consent shall not be unreasonably withheld, conditioned or delayed. In the event of an assignment or subletting, the assignee and/or subtenant shall first assume in writing all of the obligations of Tenant under this Lease and Tenant shall, for the full Term, continue to be jointly and severally liable with such assignee or subtenant for the payment of Rent and the performance of all obligations required of Tenant under this Lease. Tenant hereby acknowledges that the use to which the Premises are put and the compatibility of any occupant of the Premises with other tenants, and the use, creditworthiness, and ability to pay rent when due are of prime importance and significance to Landlord in the operation and maintenance of the Building in which the Premises are located. The consent by Landlord to an assignment or sublease will not be construed to relieve Tenant from obtaining Landlord's prior written consent in writing to any further assignment or sublease. No permitted subtenant may assign or encumber its sublease or further sublease all or any portion of its subleased space, or otherwise permit the subleased space or any part of its subleased space to be used or occupied by others, without Landlord's prior written consent in each instance. Acceptance of payments from a person or entity other than Tenant shall not constitute consent to the assignment or subletting of the Premises. If Landlord consents to a proposed assignment or sublease, then Landlord will have the right to require Tenant to pay to Landlord a sum equal to (a) 50% of any Rent or other consideration paid to Tenant by any proposed transferee that is in excess of the Rent allocable to the transferred space then being paid by Tenant to Landlord pursuant to this Lease; (b) 50% of any other profit or gain realized by Tenant from any such sublease or assignment; and (c) Landlord's reasonable attorneys' fees, consultant fees, and costs incurred in connection with negotiation, review, and processing of the transfer, not to exceed $1,500.00 per request. All such sums payable will be payable to Landlord at the time the next payment of Base Rent is due. Anything to the contrary in this Lease notwithstanding, except when the assignment or subletting is proposed to an Affiliate, at any time within ten (10) days after Landlord's receipt of all (but not less than all) of the information and documents reasonably requested by Landlord, Landlord may, at its option by written notice to Tenant, elect to: (a) sublease the Premises or the portion thereof proposed to be sublet by Tenant upon the same terms as those offered to the proposed subtenant; (b) take an assignment of the Lease upon the same terms as those offered to the proposed assignee; or (c) terminate the Lease in its entirety or as to the portion of the Premises proposed to be assigned or sublet, with a proportionate adjustment in the Rent payable hereunder if the Lease is terminated as to less than all of the Premises. If Landlord does not exercise any of the options described in the preceding sentence, then, during the above-described ten (10) business day period, Landlord shall either consent or deny its consent to the proposed assignment or subletting.

Landlord shall have the right to assign or transfer, in whole or in part every feature of its rights and obligations hereunder and the Premises provided such assignee or transferee recognizes and agrees to be bound by the terms of this Lease, and such assignment or transfer shall be in all things respected and recognized by Tenant.

20.  **Fire or Other Casualty.** In the event the Premises shall be destroyed or so damaged or injured by fire or other casualty during the Term, whereby the same shall be rendered untenantable, then Landlord shall have the right to render the Premises tenantable by repairs within two hundred twenty (220) days therefrom and this Lease shall not terminate; provided, however, Landlord shall not be required to rebuild, repair or replace any part of the partitions, fixtures, additions and other improvements which may have been placed in, on or about the Premises by Tenant. If the Premises cannot be rendered tenantable within said time, it shall be optional by either party hereto to cancel this Lease, and in the event of such cancellation, the Rent shall be paid only to the date of such fire or casualty. The cancellation herein mentioned shall be evidenced in writing. During any time that the Premises remain untenantable due to causes set forth in this paragraph, the Rent due hereunder or a just and fair proportion thereof shall abate. Notwithstanding the provisions of this Section 20, if the Premises or the Building are damaged by uninsured casualty, if the proceeds of insurance are insufficient to pay for the repair of any damage to the Premises or the Building, or if all or any portion of the proceeds of insurance are retained by Landlord's mortgagee, Landlord will have the option to repair such damage or terminate this Lease as of the date of such casualty by written notice to Tenant on or before sixty (60) days following the casualty.

21.  **Eminent Domain.** If the whole of the Premises shall be taken by any public authority under the power of eminent domain, or if so much of the Building or grounds shall be taken by any such authority under the power of eminent domain so that Tenant cannot continue to operate its business in the Premises, then the Term shall cease as of the day possession is taken by such public authority and Rents shall be paid up to that day with proportionate refund by Landlord of any such Rents as may have been

8

DocuSign Envelope ID: 4B4400B8-7605-4954-B07A-1E65A3277AE8

paid in advance or deposited as security. The amount awarded for any taking under the power of eminent domain shall belong entirely to and be the property of Landlord. Nothing herein shall limit Tenant's ability to make an independent claim for damages or awards to the extent Landlord's claims for damages are not affected.

22.    No Waiver or Accord and Satisfaction.

(a)    Neither the waiver by Landlord of any agreement, breach, condition, default, provision, requirement, or term contained in this Lease nor the acquiescence of Landlord to any violation of any agreement, breach, condition, default, provision, requirement, or term contained in this Lease, shall be deemed to be a waiver of any subsequent breach of the same or any other agreement, condition, provision, requirement, or term contained in this Lease, nor constitute a course of dealing regardless of the number of times Landlord may choose to make such a waiver or acquiesce to any violation of any agreement, breach, condition, default, provision, requirement, or term contained in this Lease; nor will any custom or practice that may come to exist between the parties in the administration of the terms of this Lease be construed to waive or to lessen the right of Landlord to insist upon the performance by Tenant in strict accordance with the terms of this Lease.

(b)    Acceptance by Landlord of Rent or other amounts due, in whole or in part, following a breach or default will not be deemed to be a waiver of any existing or preceding breach by Tenant of any agreement, condition, provision, requirement, or term of this Lease, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such Rent or other payment. However, payment of the full amount due, including any late fees, administrative charges and other amounts due, shall constitute a waiver of default for the failure of Tenant to pay the particular Rent or other payment so accepted.

(c)    No payment by Tenant or receipt by Landlord of a lesser amount than the full amount of any installment or payment of Rent or other amount due, shall be deemed to be anything other than a payment on account of the amount due, and no endorsement or statement on any check or payment of Rent or related to it shall be deemed an accord and satisfaction. Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such installment or payment of Rent or pursue any other remedies available to Landlord.

23.    Notices. Prior to the Commencement Date, all notices required under this Lease to be given to Tenant shall be given to it at _____. After the Commencement Date, all notices required under this Lease to be given to Tenant shall be given to it at the Premises, or at such other place as Tenant may designate in writing. Any such notice to be given to Landlord under this Lease shall be given to it at EastGroup Properties, 8917 Western Way, Suite 6, Jacksonville, FL 32256, or at such other place as Landlord may designate in writing. All notices shall be in writing, require a receipt, and shall be sent by certified mail, postage prepaid, or by telecopy facsimile transmission, or by personal delivery, or by commercial courier or overnight delivery service. Notices shall be deemed to have been given (i) in the case of mailing, when postmarked, (ii) in the case of telecopy transmission, when received as evidenced by written transmission report, or (iii) in the case of hand delivery or delivery by commercial courier, when delivered or refused.

24.    Subordination. This Lease is subject and subordinate to all mortgages which may now or hereafter affect the Premises or the Building of which it forms a part, and to all renewals, modifications, consolidations, replacements and extensions thereof. This clause shall be self-operative, and no further instrument of subordination shall be required.

25.    Fixtures and Alterations. Tenant shall not, without Landlord's prior written consent, attach any fixtures in or to the Premises or change, alter or make additions to the Premises, nor attach or affix any article hereto, nor permit any annoying sound device, overload any floor, or deface the Premises. Any attached fixtures or any alterations, additions or improvements made to or attached by Tenant upon the Premises shall, on the expiration or termination of this Lease, if requested by Landlord, be promptly removed at Tenant's expense and the Premises restored by Tenant at its expense to its original condition, ordinary wear and tear excepted. Any such fixture, alteration, addition and/or improvement not requested to be removed shall remain in the Premises in good operating condition and in compliance with all laws (including without limitation, the National Electric Code) and shall become and remain the property of Landlord. All of Tenant's fixtures, installations and personal property not removed from the Premises upon the expiration or termination, and not required by Landlord to have been removed as provided in this paragraph, shall be conclusively presumed to have been abandoned by Tenant and title thereto shall pass to Landlord under this Lease as if by a bill of sale. Shelving and storage systems not acquired with the Allowance defined in paragraph 36 hereof shall remain Tenant's

9

DocuSign Envelope ID: 4B4400B8-7605-4954-B07A-1E65A3277AE8

property, notwithstanding the attachment or installation method thereof, so long as it is timely removed upon the expiration hereof and any damage caused by installation or removal thereof is repaired by Tenant at its sole cost.

Tenant shall submit drawing to Landlord for approval for any modifications or improvements to the Premises. Tenant shall comply with the requirements of all applicable governmental authorities and the Americans with Disabilities Act, 42 U.S.C. 12101 et seq. (ADA) in connection with the modification or improvements, including but not limited to, performing alterations and/or upgrades to the Premises or Building as required by ADA or such governmental authorities in connection with the modification or improvements.

26.  Redelivery of Premises.  Tenant shall, on the expiration of this Lease, deliver up the Premises in as good order and condition as it now is or may be put by Landlord, reasonable use and ordinary wear and tear thereof and damage by fire or other unavoidable casualty, condemnation excepted.  Additionally, Tenant shall promptly surrender all keys to the Premises to Landlord.

27  Examination and Exhibiting of Premises.  Landlord or its duly authorized agent shall have the right to enter the Premises at all reasonable times to examine the condition of and to make repairs to the Premises or the Building.  Within six (6) months prior to the date of the expiration of the Lease, Landlord or its authorized agent shall have the right to enter the Premises at all reasonable times for the purpose of exhibiting the same to prospective tenants.

28.  Events of Default.  Any of the following events or occurrences shall constitute a breach of this Lease by Tenant and shall constitute and "Event of Default" hereunder:

(a)  The failure of Tenant to pay any Rents or other amounts due under this Lease, on or before the date when due.

(b)  The failure of Tenant to observe or perform any other covenant, agreement, condition or provision of the Lease within the time period in which such covenant, agreement, condition or provision is required to be performed by the terms of this Lease, or, if no time period is specified for performance, within twenty (20) days after written notice of such failure to Tenant.

(c)  If Tenant becomes insolvent or admits in writing its inability to pay its debts as they mature, or makes an assignment for the benefit of creditors, or applies or consents to the appointment of a trustee or receiver for Tenant or for a major part of its property.

(d)  The appointment of a trustee or a receiver to take possession of all or substantially all of Tenant's property, or the attachment, execution or other judicial seizure of all or substantially all of Tenant's assets located at the Premises, unless such appointment, attachment, execution or seizure is discharged within thirty (30) calendar days after the appointment, attachment, execution or seizure.

(e)  The institution of bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or any other proceedings for relief under any bankruptcy or insolvency law or any other similar law for the relief of debtors, by or against Tenant, and if instituted against Tenant, the same are not dismissed within thirty (30) calendar days after the institution of such proceedings.

(f)  Tenant shall repeatedly default in the timely payment of Rent, or any other charges required to be paid, or shall repeatedly default in keeping, observing or performing any other covenant, agreement, condition or provision of this Lease, whether or not Tenant shall timely cure any such payment or other default.  For the purposes of this Subsection, the occurrence of similar defaults two (2) times during any twelve (12) month period shall constitute a repeated default. Landlord shall not be required to provide Tenant any cure periods upon the occurrence of a repeated default.

Any notice periods provided for under this Section 28 shall run concurrently with any statutory notice periods and any notice given hereunder may be given simultaneously with or incorporated into any such statutory notice.

DocuSign Envelope ID: 4B4400B8-7605-4954-B07A-1E65A3277AE8

29.    Landlord's Remedies.  On the occurrence of any such Event of Default, Landlord shall, in addition to any other rights or remedies available to Landlord under this Lease and under the laws of the State of Florida, have the following rights and remedies:

(a)    Re-Entry Without Termination.  To the extent permitted by applicable law, Landlord may re-enter the Premises without terminating this Lease, and remove all persons and property from the Premises (without causing a breach of the peace), and relet the Premises or any part thereof for the account of Tenant, for such time (which may be for a term extending beyond the Term) and upon such terms as Landlord in Landlord's sole discretion shall determine, and Landlord shall not be required to accept any Tenant offered by Tenant or to observe any instructions given by Tenant relative to such reletting. In the event of any such reletting, Landlord may make repairs, alterations and additions in or to the Premises and redecorate the same to the extent deemed necessary or desirable by Landlord and in connection therewith change the locks to the Premises, and Tenant shall upon demand pay the cost thereof together with Landlord's expenses of reletting.  Landlord may collect the Rent from any such reletting and apply the same first to the payment of the expenses of re-entry, redecoration, repairs and alterations and the expenses of reletting and second to the payment of Rental herein provided to be paid by Tenant, and any excess or residue shall operate only as an offsetting credit against the amount of Rental as the same thereafter becomes due and payable hereunder.  No such re-entry or repossession, repairs, alterations and additions or reletting shall be construed as an eviction or ouster of Tenant or as an election on Landlord's part to terminate this Lease unless a written notice of such intention be given to Tenant, nor shall the same operate to release Tenant in whole or in part from any of Tenant's obligations hereunder, and Landlord may, at any time and, from time to time, sue and recover judgment for any deficiencies from time to time remaining after the application from time to time of the proceeds of any such reletting.

(b)    Acceleration.  On the occurrence of any such Event of Default, Landlord may declare the entire amount of Rent and any other sums or charges which would become due and payable from Tenant to Landlord during the remainder of the Term to be due and payable immediately, in which event, Tenant agrees to pay the sum at once, together with all Rent, including any other sum theretofore due; provided, however, that such payment shall not constitute a penalty or forfeiture or liquidated damages but shall merely constitute payment in advance of the Rent for the remainder of the Term.

(c)    Self Help.  To the extent permitted by applicable law, Landlord may enter upon the Premises, without being liable for prosecution or any claim of damages therefor and do whatever Tenant is obligated to do under the terms of this Lease, and Tenant agrees to reimburse Landlord on demand for any expenses which Landlord may incur in thus effecting compliance with Tenant's obligations under this Lease.

(d)    Other Enforcement.  Landlord may enforce the provisions of this Lease and may enforce and protect the rights of Landlord hereunder by a suit or suits in equity or at law for specific performance of any covenant or agreement contained herein, or for the enforcement of any other legal or equitable remedy, including recovery of all monies due or to become due from Tenant under any of the provisions of this Lease.

(e)    Termination.  Upon the occurrence of an Event of Default beyond any applicable notice period, Landlord shall be entitled to terminate this Lease by providing written notice thereof to Tenant.

(f)    Remedies Cumulative.  The rights, privileges, elections and remedies of Landlord under this Lease shall be cumulative, and Landlord shall have the right to exercise such remedies at any time and from time to time singularly or in combination. No termination of this Lease (whether upon an Event of Default or otherwise) shall be deemed to limit or negate Landlord's rights hereunder to indemnification from Tenant (or Tenant's insurance carriers) for any claim or liability asserted against or imposed upon Landlord, whether before or after the termination of this Lease, which is directly or indirectly based upon death, personal injury, property damage or other matters occurring prior to the termination thereof. . Notwithstanding the foregoing, Landlord shall have a duty to mitigate damages as set forth in subsection (i) below.

(g)    Attorneys' Fees and Collection Charges.  In the event of any legal action or proceeding is brought by either party to enforce this Lease, the non-prevailing party shall pay all expenses of the prevailing party incurred in connection with such action or proceeding, including court costs and reasonable attorneys' fees at or before the trial level and in any appellate or bankruptcy proceeding.

11

(h)     Emergencies. In addition to the rights and remedies set forth in this Section 29, if an Event of Default occurs and such failure, in Landlord's reasonable opinion, creates an emergency situation or affects the value or integrity of the Premises of the Building, then Landlord may perform any such obligations on behalf of Tenant. Any reasonable amount paid, or expense or liability incurred by Landlord in the performance of any such matter for the account of Tenant shall be deemed to be additional Rent and the same together with interest thereon at the rate of twelve percent (12%) per annum from the date upon which any such expense shall have been incurred may be added, at the option of Landlord, to any Rent then due or thereafter falling due hereunder.

(i)     Mitigation of Damages. Landlord agrees to use commercially reasonable efforts to mitigate damages resulting from a default by Tenant, but such agreement is limited to using objectively reasonable efforts to relet the Premises to a replacement tenant suitable under the circumstances, which duty to relet the Premises does not require Landlord to (i) give priority to the Premises over other premises owned or managed by Landlord or its affiliates, (ii) relet for less than market rent, or (iii) relet to a tenant (or for a use) that is not in keeping with the first class character of the Center. Further, any breach of Landlord's agreement to relet the Premises does not give rise to a cause of action by Tenant, but rather, will reduce Landlord's recovery against Tenant to the extent that damages reasonably could have been avoided had Landlord complied with its agreement to mitigate.

30.     Construction Liens. The interest of Landlord in the Premises shall not be subject in any way to any liens, including but not limited to real estate sales commission liens and construction liens for improvements to or other work performed with respect to the Premises by or on behalf of Tenant. Tenant shall have no power or authority to create any lien or permit any lien to attach to the present estate, reversion, or other estate of Landlord (or the interest of any ground Landlord) in the Premises, Building or in the Center and all mechanics, materialmen, contractors, artisans, and other parties contracting with Tenant or its representatives or privies with respect to the Premises or any part of the Premises are hereby charged with notice that they must look to Tenant to secure payment of any bill for work done or material furnished or for any other purpose during the Term. The foregoing provisions are made with express reference to Section 713.10, Florida Statutes (1995). Notwithstanding the foregoing provisions, Tenant, at its expense, shall cause any lien filed against the Premises, Building or the Center for work or materials claimed to have been furnished to Tenant to be discharged of record or properly transferred to a bond pursuant to Section 713.24, Florida Statutes (1995), within ten (10) days after notice thereof to Tenant. Further, Tenant agrees to indemnify, protect, defend, and save Landlord harmless from and against any damage or loss, including reasonable attorneys' fees, incurred by Landlord as a result of any such lien. Tenant shall notify every contractor making improvements to the Premises that the interest of Landlord in the Premises shall not be subject to liens for improvements to or other work performed with respect to the Premises by or on behalf of Tenant. Tenant shall execute, acknowledge, and deliver without charge a short form of lease or notice in recordable form containing a confirmation that the interest of Landlord in the Premises and the Building shall not be subject to liens for improvements or other work performed with respect to the Premises by or on behalf of Tenant. If such a short form of lease or notice is executed, it shall expressly provide that it shall be of no further force or effect after the last day of the Term or on the filing by Landlord of an affidavit that the Term has expired, or the Lease has been terminated or that Tenant's right to possession of the Premises has been terminated.

31.     Estoppel Certificate. Tenant and Landlord, upon written request, one from the other, shall give or exchange with, one with the other, estoppel certificates which shall confirm to others that this Lease is in full force and effect, that neither party is in default and/or such other information regarding this Lease as may be reasonably appropriate and factual.

32.     Hazardous Material. Throughout the Term of this Lease, Tenant shall prevent the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials (as hereinafter defined) on, under, in, above, to, or from the Premises by Tenant, its employees, agents, servants, subtenants, contractors and invitees (the "Tenant Parties") except for activities which are part of the ordinary course of Tenant's business and are conducted in strict compliance with all applicable federal, state, and local laws, rules, regulations, and orders. For purposes of this provision, the term "Hazardous Materials" shall mean and refer to any wastes, materials, or other substances of any kind or character that are or become regulated as hazardous or toxic waste or substances, or which require special handling or treatment, under any applicable local, state, or federal law, rule, regulation, or order. Tenant shall protect, defend, indemnify, and hold Landlord harmless from and against (a) any loss, cost, expense, claim, or liability arising out of or in connection with any investigation, monitoring, clean-up, containment, removal, storage, or restoration work (herein referred to as "Remedial Work") required by, or incurred by, Landlord or any other person or party in a reasonable belief that such Remedial Work is required by any applicable federal, state or local law, rule, regulation or order, or by any governmental agency, authority, or political subdivision having

12

DocuSign Envelope ID: 4B4400B8-7605-4954-B07A-1E65A3277AE8

jurisdiction over the Premises, as a result of the actions or omissions of any of the Tenant Parties, and (b) any loss, injury, expense, or damage arising out of the presence, release, or discharge of any Hazardous Materials on, under, in, above, to, or from the Premises by any of the Tenant Parties. In the event any such Remedial Work is so required under any applicable federal, state, or local law, rule, regulation or order, Tenant shall promptly perform or cause to be performed such Remedial Work in compliance with such law, rule, regulation, or order. In the event Tenant shall fail to commence the Remedial Work in a timely fashion, or shall fail to prosecute diligently the Remedial Work to completion, such failure shall constitute an Event of Default on the part of Tenant under the terms of this Lease, and Landlord, in addition to any other rights or remedies afforded it hereunder, may, but shall not be obligated to, cause the Remedial Work to be performed, and Tenant shall promptly reimburse Landlord for the cost and expense thereof upon demand.

33.    Intentionally Omitted

34.    Landlord's Lien.  In addition to and cumulative of Landlord's statutory lien, Tenant hereby grants to Landlord a security interest in and to all furniture, furnishings, fixtures, equipment, merchandise and other property placed in the Premises by Tenant to secure the performance of Tenant's obligations under this Lease. At Landlord's request, Tenant shall execute and cause to be filed in the appropriate public records all documents required to perfect such security interest pursuant to the terms of the Uniform Commercial Code in effect in the state where the Premises is located. Landlord's lien shall be subordinate to any third-party financing of the Tenant's property.

35.    [Intentionally omitted].

36.    Tenant Improvements.  Landlord and Tenant acknowledge and agree that Tenant desires to perform certain additional improvements to the Premises (the "Tenant Improvements"). Subject to the development and approval of mutually satisfactory plans and specifications, Landlord agrees to provide Tenant with a tenant improvement allowance in the amount of up to $147,544.80, or $1.95 per square foot of the Premises, (the "Allowance") to be used only towards the Tenant Improvements and, subject to the prior written approval by Landlord, which will not be unreasonably withheld or delayed. Any and all costs in excess of the Allowance shall be the sole responsibility of Tenant. All contractors employed by Tenant shall be subject to the prior written approval of Landlord, which shall not be unreasonably withheld. Upon substantial completion of the Tenant Improvements, Tenant shall submit to Landlord for reimbursement copies of paid invoices up to the Allowance amount for such work performed together with final lien waivers from Tenant's contractor(s). Landlord shall reimburse Tenant within thirty (30) days of receipt of request for payment from Tenant accompanied by such invoices and lien waivers. Any portion of the Allowance remaining unused by Tenant within twelve (12) months of Commencement Date shall be deemed waived by Tenant, and Landlord shall have no obligation to provide such remaining funds. Notwithstanding anything to the contrary in this Agreement, Landlord shall not be required to make any payment or application of the Allowance with respect to any period during which an event of default by Tenant shall have occurred and is continuing.

37.    Renewal Option.  Landlord hereby grants to Tenant the right and option to renew and extend the term of this Lease for one (1) term of sixty (60) months (the "Renewal Period"). In the event Tenant elects to exercise the option described herein, all terms and conditions of this Lease shall continue in full force and effect except as set forth in this paragraph. The monthly rent to be paid during the Renewal Period (the "Renewal Rate") shall be the fair market value of the Premises as determined by the market rental rate for buildings comparable to the Premises, at the commencement of the Renewal Period, for space of equivalent quality, size, utility and location, with the length of the Renewal Period and the credit standing of Tenant to be taken into account. Notice of Tenant's intention to exercise the option must be given to Landlord in writing not less than nine (9) months prior to, nor more than twelve (12) months prior to, the expiration of the initial Term of this Lease, and Tenant must not be in default under this Lease at either the time that this option must be exercised or the commencement of the Renewal Period; otherwise, this Renewal Option shall be null and void and of no further force or effect. Tenant's failure to give notice of exercise of the Renewal Option shall be deemed a waiver of such option and such option will then be of no further force or effect. Landlord shall deliver written notice (the "Landlord Notice") to Tenant, within fifteen (15) days after Landlord's receipt of a timely Renewal Option notice, which sets forth the Renewal Rate after the Landlord's reasonable determination of the fair market value of the Premises as set forth in this paragraph. Landlord and Tenant shall negotiate in good faith to attempt to reach agreement on the Renewal Rate. If Landlord and Tenant agree on the Renewal Rate, Tenant shall promptly execute and deliver an amendment of the Lease in form and substance satisfactory to Landlord and Tenant to evidence the exercise of this Renewal Option and the effect thereof.

DocuSign Envelope ID: 4B4400B8-7605-4954-B07A-1E65A3277AE8

If Landlord and Tenant are unable to come to an agreement as to the Renewal Rate within thirty (30) days of the Landlord Notice, then the Renewal Rate shall be determined by a board of three (3) licensed commercial real estate brokers, one of whom shall be named by Landlord, one of whom shall be named by Tenant, and the two so appointed shall select a third. Each real estate broker so selected shall be licensed in the jurisdiction in which the Premises is located as a real estate broker specializing in the field of commercial office/warehouse leasing in the Jacksonville, Florida metropolitan area, having no less than ten (10) years' experience in such field, and recognized as ethical and reputable within the field. Landlord and Tenant agree to make their appointments promptly within ten (10) days after the expiration of the thirty (30) day period, or sooner if mutually agreed upon. The two (2) brokers selected by Landlord and Tenant shall promptly select a third broker within ten (10) days after both brokers have been appointed. Within ten (10) days after the selection of the third broker, Landlord shall submit in writing Landlord's proposed Renewal Rate and Tenant shall submit in writing Tenant's proposed Renewal Rate to such third broker. The third broker shall select whichever of Landlord's proposed Renewal Rate or Tenant's proposed Renewal Rate is closer to such broker's determination of the fair market value of the Premises. Such broker shall not be empowered to select or craft any additional or further proposed rates. The proposed Renewal Rate chosen by the third broker shall be binding on both Landlord and Tenant as the Renewal Rate for the Premises during the Renewal Period. If the third broker believes that expert advice would materially assist him/her, he/she may retain one or more qualified persons to provide such expert advice. The parties shall share equally in the costs of the third broker and of any experts retained by such broker. Any fees or costs of the broker selected directly by Landlord or Tenant, however, shall be borne by the party selecting such broker. The third broker shall render his/her determination within ten (10) days of the date the third broker is selected. If either party fails to submit its proposed Renewal Rate within the ten (10) day period, the proposed Renewal Rate submitted by the other party shall be selected. The Renewal Rate selected by the third broker shall be final and binding upon both Landlord and Tenant and shall be the Renewal Rate for the Renewal Period.

In the event the Premises are sublet or assigned other than to a Permitted Assignee, this Renewal Option will be null and void and of no further effect.

38.    Miscellaneous.

(a)    All approvals required of and between Landlord and Tenant under the provisions of this Agreement shall be in writing and shall not be unreasonably withheld or delayed unless otherwise expressly provided.

(b)    It is understood and agreed that in the event any provision of this Lease shall be adjudged, decreed, held or ruled to be invalid, such portion shall be deemed severable, and it shall not invalidate or impair the agreement as a whole or any other provision of the agreement.

(c)    This Lease and all provisions, covenants and conditions thereof shall be binding upon and inure to the benefit of the heirs, legal representatives, and successors, and assigns of the parties hereto, except that no person, firm, corporation nor court officer holding under or through Tenant in violation of any of the terms, provisions or conditions of this Lease, shall have any right, interest or equity in or to this Lease, the terms of this Lease or the Premises.

(d)    Landlord shall have the right, at any time without liability to Tenant to make, at Landlord's own expense, repairs, alterations, additions and improvements, structural or otherwise, in or to the Premises, the Building or any part thereof, and to perform any acts related to the safety, protection and preservation thereof, and during such operations to take into and through the Premises or any part of the Building all material and equipment required and to close or temporarily suspend operation of entrances, doors, corridors or other facilities, provided that Landlord shall cause as little inconvenience or annoyance to Tenant as is reasonably necessary in the circumstances, and shall not do any act which permanently reduces the size of the Premises. Landlord may do any such work during ordinary business hours and Tenant shall pay Landlord for overtime and other expenses incurred if such work is done during other hours at Tenant's request.

(e)    Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit, pursuant to Section 404.056(8), Florida Statutes.

DocuSign Envelope ID: 4B4400B8-7605-4954-B07A-1E65A3277AE8

(f)     This Lease and the addenda attached hereto constitute the entire agreement between the parties and supersedes all prior agreements.  No waiver, modifications, additions or addenda to this Lease shall be valid unless in writing and signed by both Landlord and Tenant.

(g)     This Lease shall be governed by and construed in accordance with the laws of the State of Florida.

(h)     Time is of the essence of each and every provision of this Lease.

(i)     No Offer:  This Lease is submitted to Tenant on the understanding that it will not be considered an offer by Landlord and will not bind Landlord in any way until (a) Tenant has duly executed and delivered four (4) duplicate originals to Landlord and (b) Landlord has executed and delivered one of such originals to Tenant.  Tenant's offer of this Lease shall be irrevocable and open for acceptance by Landlord until 5:00 p.m. on the fifteenth (15th) day after execution and delivery hereof by Tenant, and if not accepted by then may be withdrawn by Tenant.

(j)     No Construction Against Drafting Party:  Landlord and Tenant acknowledge that each of them and their counsel have had an opportunity to review this Lease and that this Lease will not be construed against Landlord merely because Landlord has prepared it.  This Lease is to be construed in such a manner as to give effect to the provisions herein.

(k)     No Recording of Lease.  This Lease MUST NOT BE RECORDED in any official Public Records, without Landlord's written consent, which consent may be arbitrarily withheld.  Tenant's recording this Lease or any memorandum or short form of it will be void and shall constitute an Event of Default under this Lease.

(l)     Waiver of Jury Trial:  Landlord and Tenant by this subparagraph waive trial by jury in any action, proceeding, or counterclaim brought by either of the parties to this Lease against the other on any matters whatsoever arising out of or in any way connected with this Lease and other documents related to it or arising from it, the relationship of landlord and tenant, Tenant's use or occupancy of the Premises, or any other claims (including without limitation claims for personal injury or property damage), and any emergency statutory or any other statutory remedy.  Landlord and Tenant are each entering into this waiver as they desire to avoid delays in the resolution of disputes arising out of the above referenced documents and their landlord and tenant relationship.

(m)     Warranty of Authority:  Tenant and the party(ies) executing this Lease on behalf of Tenant represent and warrant to Landlord that such party(ies) is/are authorized to do so by requisite action of the board of directors or partners, as the case may be, and agree upon request to deliver to Landlord a resolution or similar document to that effect.

(n)     Notwithstanding anything in this Lease to the contrary, Landlord shall never be liable to Tenant for any loss of business or profits or other special, incidental, indirect or consequential damages or for punitive or special damages of any kind.  None of Landlord's officers, employees, agents, directors, shareholders, or partners shall ever have any personal liability to Tenant under or in connection with this Lease.  Tenant shall look solely to Landlord's estate and interest in the Building for the satisfaction of any right or remedy of Tenant under this Lease, or for the collection of any judgment (or other judicial process) requiring the payment of money by Landlord, and no other property or assets of Landlord or its principals shall be subject to levy, execution, or other enforcement procedure for the satisfaction of Tenant's rights or remedies under this Lease, the relationship of Landlord and Tenant under this Lease, Tenant's use and occupancy of the Premises, or any other liability of Landlord to Tenant of whatever kind or nature.

(o)     Brokers:  Landlord and Tenant respectively represent and warrant to each other that neither of them nor any of their representatives, employees or agents have consulted or negotiated with any broker or finder with regard to this Lease or the Premises except Newmark Phoenix Realty Group, representing Tenant ("Tenant's Broker") and NAI Hallmark representing Landlord ("Landlord's Broker").  Landlord and Tenant each will indemnify the other against, and hold the other harmless from, any claims for fees or commissions from anyone with whom either of them has consulted or negotiated with regard to the Premises except the brokers named herein.  Landlord will pay the fees or commissions due to Tenant's Broker and Landlord's Broker pursuant to a separate written agreement between Landlord such Brokers.

(p)     No Easements for Air or Light:  Any diminution or shutting off of light, air, or view, by any structure that may be erected on the Center or on lands adjacent to the Building will in no way affect this Lease or impose any liability on

15

DocuSign Envelope ID: 4B4400B8-7605-4954-B07A-1E65A3277AE8

Landlord.

(q)   Except for the payment of sums due under this Lease, each party hereto shall be excused for the period of any delay and shall not be deemed in default with respect to the performance of any of its obligations when prevented from so doing by a cause beyond such party's reasonable control, including labor disputes, government regulations, fire or casualty, inability to obtain any materials or services, or Acts of God.

(r)   Interlineation:  Whenever in this Lease any printed portion has been stricken, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included in this Lease and no inference shall be drawn from the stricken material which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained in this Lease.

(s)   Surrender:  No act or thing done or omitted to be done by Landlord or Landlord's agent during the Term of this Lease will constitute a constructive eviction by Landlord, nor will it be deemed an acceptance of surrender of the Premises, and no agreement to accept such termination or surrender will be valid unless in a writing signed by Landlord.  The delivery of keys to any employee or agent of Landlord will not operate as a termination of this Lease or a surrender of the Premises unless such delivery of keys is done in connection with a written instrument executed by Landlord approving such termination or surrender.

(t)   Survival of Obligations:  Any obligations of Tenant accruing prior to the date of the expiration or earlier termination of this Lease, or if Tenant continues to occupy the Premises after the expiration or earlier termination of this Lease, on the date Tenant completely vacates the Premises shall survive the same, and Tenant shall promptly perform all such obligations whether or not this Lease has expired or been terminated.

(u)   Landlord shall have the right from time to time to prescribe reasonable rules and regulations (the "Rules and Regulations") for Tenant's use of the Premises and the Building.  A copy of Landlord's current Rules and Regulations respecting the Premises and the Building is attached hereto as Exhibit "C".  Tenant shall abide by and actively enforce on all its employees, agents, invitees and licensees such regulations including, without limitation, rules governing parking of vehicles.

(v)   This Lease may be signed in any number of counterparts, each of which shall be an original for all purposes, but all of which taken together shall constitute only one agreement.  The production of any executed counterpart of this Lease shall be sufficient for all purposes without producing or accounting for the other counterparts hereof.  Telecopied signatures or scanned and electronically transmitted signatures may be used in place of original signatures on this Lease.  Landlord and Tenant intend to be bound by the signatures on the telecopied document or electronic transmission, are aware that the other party will rely on such signatures, and hereby waive any and all defenses to the enforcement of the terms of this Lease based on the form of signature.

(w)   Landlord will deliver a current and accurate floor plan and layout of the Premises and any existing Life Safety Plan within 10 days of a fully executed lease.

39.   Addenda/Exhibits.  The additional Addenda and Exhibits (if any) listed below or attached hereto are hereby incorporated by reference and made a part of this Lease:

> Exhibit "A" –Premises
> Exhibit "B" – EastGroup Standard Tenant Signage Criteria
> Exhibit "C" – Rules and Regulations

*[See next page for signatures]*

DocuSign Envelope ID: 4B4400B8-7605-4954-B07A-1E65A3277AE8

IN WITNESS WHEREOF, Landlord and Tenant have hereunto executed this Lease as of the day and year first above written.

LANDLORD:

**EastGroup Properties, L.P.,**
**A Delaware limited partnership**

By: **EastGroup Properties General Partners, Inc.,**
a Delaware corporation, its General Partner

By: _____
     —657CFC6FB25C4A2...

Name: _____Jaclyn Kennedy_____

Title: _____Senior Asset Analys_____

By: _____
     —D3532A3FF9704E5...

Name: _____John Coleman_____

Title: Vice President

TENANT

**Franklin Southern Manufacturing LLC,**
a Florida limited liability company

By: _____Billy M. Sermons_____

Name: _____Billy M. SERMONS_____

Title: _____President / CEO_____

DocuSign Envelope ID: 4B4400B8-7605-4954-B07A-1E65A3277AE8

## EXHIBIT "A"

## PREMISES





DocuSign Envelope ID: 4B4400B8-7605-4954-B07A-1E65A3277AE8

## EXHIBIT "B"

## EASTGROUP STANDARD TENANT SIGNAGE CRITERIA

1. Dimensions shall be 2' x 8' oval cabinets centered above entrance

2. Pan face

3. Illuminated or Non-Illuminated

All signage design must be approved by Landlord in writing, which shall not be unreasonably withheld or delayed

DocuSign Envelope ID: 4B4400B8-7605-4954-B07A-1E65A3277AE8

## EXHIBIT "C"
## RULES AND REGULATIONS

1.  Tenant shall faithfully observe and comply with the rules and regulations of the building as may be included in this Lease and modified or added to from time to time by the Landlord. Landlord shall not be responsible to Tenant for the nonperformance of any of said Rules and Regulations by any other tenant or occupant of the Building.

2.  The sidewalks, entry passages, corridors, and stairways shall not be obstructed by Tenant or used by it for other than those of ingress and egress.

3.  No cargo or delivery vans, trucks or other similar vehicles shall be permitted to park in front of the Building other than temporary delivery. These approved vehicles should park directly behind the rear of tenant's rental space. Materials stored or placed by tenant visible from outside the building will not be permitted.

4.  No tenant shall smoke or use or keep in the Premises or the Building, any kerosene, gasoline, or inflammable or combustible fluid or material other than limited quantities thereof reasonably necessary for the operation or maintenance of office equipment. No tenant shall use or keep or permit to be used or kept any foul or noxious gas or substance in the Premises or permit or suffer the Premises to be occupied or used in a manner offensive or objectionable to Landlord or other occupants of the Building by reason of noise, odors or vibrations, or interfere in any way with other tenants or those having business in the Building, nor shall any animals or birds be brought or kept in the Premises or the Building.

5.  Each tenant shall ensure that the doors of its Premises are closed and locked and that all water faucets and water apparatus are shut off before Tenant or Tenant's employees leave the Premises so as to prevent waste or damage. For any default or carelessness in this regard Tenant shall make good all damages sustained by other tenants or occupants of the Building or Landlord.

6.  No tenant shall install any radio or television antenna, loudspeaker, or other device on the roof, exterior walls of the Building, or on the property or perimeter of property, without written permission. No TV, radio or recorder shall be played in such a manner as to cause a nuisance to any other tenant.

7.  Each tenant shall store all its trash and garbage within its Premises. No material shall be placed in the trash boxes or receptacles if such material is of such nature that it may not be disposed of in the ordinary and customary manner of removing and disposing of trash and garbage in Duval County without being in violation of any law or ordinance governing such disposal.

8.  Canvassing, soliciting, distribution of handbills or any other written material and peddling in the Building or on the site are prohibited, and each tenant shall cooperate to prevent the same.

9.  The Tenant may not store or place rubbish, pallets or other by-products of shipping or manufacturing outside their Premises. All such items must be hauled away without delay and at the sole cost and expense of the Tenant. Violations of the Rules and Regulations for Trash disposal are fineable occurrences, at the cost of rectifying such violation plus a 20% administrative fee. Such fines are considered "Additional Rent" as defined in the Lease and non-payment of fines shall constitute an Event of Default under the Lease.

10. These Rules and Regulations are in addition to and shall not be construed to in any way modify or amend, in whole or in part, the agreements, covenants, conditions and provisions of any Lease of the Premises in the Building. The terms, covenants and conditions set forth in the Lease shall govern in the event of any inconsistency or ambiguity between the Rules and Regulations and the Lease.

11. Landlord reserves the right to make such other rules and regulations as in its judgment may from time to time be needed for the safety, care and cleanliness of the Building and for the preservation of good order therein. Notice of any such amendment or modification will be provided to Tenant, and Tenant will comply with them provided they are reasonable.

64463226 v1

Exhibit "B"

## Lease Ledger

Date: 07/28/2023

Property: deerwd

Tenant: t0002871 FRANKLIN SOUTHERN MANUFACTURING LLC (DIP 4/27/2023)

From Date: 06/01/2022  To Date: 05/31/2027

Move In Date: 06/01/2022

Unit(S): 01, 02, 06

| Date | Description | Unit | Charge | Payment | Balance | Chg/Rec | Hold |
|------|-------------|------|--------|---------|---------|---------|------|
| 5/26/2022 | Chk# 54736864A | | 0.00 | 108,706.46 | -108,706.46 | R-287734 | |
| 5/27/2022 | Security Deposit Required | | 41,914.06 | 0.00 | -66,792.40 | C-705576 | No |
| 5/29/2022 | Small balance adjustment | | 0.01 | 0.00 | -66,792.39 | C-705582 | No |
| 6/1/2022 | CAM Estimate (06/2022) | 01,02,06 | 11,034.33 | 0.00 | -55,758.06 | C-705577 | No |
| 6/1/2022 | Base Rent (06/2022) | 01,02,06 | 51,388.47 | 0.00 | -4,369.59 | C-705578 | No |
| 6/1/2022 | Sales Tax for Base Rent (06/2022) | 01,02,06 | 3,597.19 | 0.00 | -772.40 | C-705579 | No |
| 6/1/2022 | Sales Tax for CAM Estimate (06/2022) | 01,02,06 | 772.40 | 0.00 | 0.00 | C-705580 | No |
| 6/29/2022 | TI Allowance Rmb 42% per Lease Agmt | | -61,398.11 | 0.00 | -61,398.11 | C-710587 | No |
| 6/29/2022 | Amount to be refunded | | 61,398.11 | 0.00 | 0.00 | C-710588 | No |
| 6/29/2022 | Quick refund (Payable) ctr# 498995 | | -61,398.11 | 0.00 | -61,398.11 | P-498995 | |
| 6/30/2022 | Chk# 229532 to payable | | 0.00 | -61,398.11 | 0.00 | K-291737 | |
| 7/1/2022 | CAM Estimate (07/2022) | 01,02,06 | 11,034.33 | 0.00 | 11,034.33 | C-706194 | No |
| 7/1/2022 | Sales Tax for CAM Estimate (07/2022) | 01,02,06 | 772.40 | 0.00 | 11,806.73 | C-706195 | No |
| 7/1/2022 | Base Rent (07/2022) | 01,02,06 | 51,388.47 | 0.00 | 63,195.20 | C-706196 | No |
| 7/1/2022 | Sales Tax for Base Rent (07/2022) | 01,02,06 | 3,597.19 | 0.00 | 66,792.39 | C-706197 | No |
| 7/6/2022 | Chk# :ACH-WEB Online Payment - EFT Payment. Web - Tenant Services | | 0.00 | 66,792.39 | 0.00 | R-291714 | |
| 7/19/2022 | JEA #4473344200 6/10 Electric | | 141.63 | 0.00 | 141.63 | C-715127 | No |
| 7/25/2022 | ACA ctrl#39004 Chk#6406 : Automated Cash Application Payment | | 0.00 | 141.63 | 0.00 | R-292451 | |
| 7/28/2022 | Chk# :ACH-WEB Online Payment - EFT Payment. Web - Tenant Services | | 0.00 | 66,792.39 | -66,792.39 | R-292730 | |
| 8/1/2022 | CAM Estimate (08/2022) | 01,02,06 | 11,034.33 | 0.00 | -55,758.06 | C-711392 | No |
| 8/1/2022 | Sales Tax for CAM Estimate (08/2022) | 01,02,06 | 772.40 | 0.00 | -54,985.66 | C-711393 | No |
| 8/1/2022 | Base Rent (08/2022) | 01,02,06 | 51,388.47 | 0.00 | -3,597.19 | C-711394 | No |
| 8/1/2022 | Sales Tax for Base Rent (08/2022) | 01,02,06 | 3,597.19 | 0.00 | 0.00 | C-711395 | No |
| 8/11/2022 | JEA #4473344200 7/12 Electric | | 1,024.87 | 0.00 | 1,024.87 | C-715463 | No |
| 8/24/2022 | ACA ctrl#40255 Chk#6445 : Automated Cash Application Payment | | 0.00 | 1,024.87 | 0.00 | R-294929 | |
| 9/1/2022 | CAM Estimate (09/2022) | 01,02,06 | 11,034.33 | 0.00 | 11,034.33 | C-715821 | No |
| 9/1/2022 | Sales Tax for CAM Estimate (09/2022) | 01,02,06 | 772.40 | 0.00 | 11,806.73 | C-715822 | No |
| 9/1/2022 | Base Rent (09/2022) | 01,02,06 | 51,388.47 | 0.00 | 63,195.20 | C-715823 | No |
| 9/1/2022 | Sales Tax for Base Rent (09/2022) | 01,02,06 | 3,597.19 | 0.00 | 66,792.39 | C-715824 | No |
| 9/2/2022 | Chk# :ACH-WEB Online Payment - EFT Payment. Web - Tenant Services | | 0.00 | 66,792.39 | 0.00 | R-296632 | |
| 9/5/2022 | First Coast Elevator #7779 | | 195.00 | 0.00 | 195.00 | C-720088 | No |
| 9/19/2022 | JEA #4473344200 8/10 Electric | | 1,255.90 | 0.00 | 1,450.90 | C-722745 | No |
| 9/26/2022 | ACA ctrl#41489 Chk#706 : Automated Cash Application Payment | | 0.00 | 1,450.90 | 0.00 | R-297464 | |

**Page 1 of 4**

7/28/2023 3:27 PM

## Lease Ledger
Date: 07/28/2023
Property: deerwd
Tenant: t0002871 FRANKLIN SOUTHERN MANUFACTURING LLC (DIP 4/27/2023)
From Date: 06/01/2022  To Date: 05/31/2027
Move In Date: 06/01/2022
Unit(S): 01, 02, 06

| Date | Description | Unit | Charge | Payment | Balance | Chg/Rec | Hold |
|------|-------------|------|--------|---------|---------|---------|------|
| 10/1/2022 | CAM Estimate (10/2022) | 01,02,06 | 11,034.33 | 0.00 | 11,034.33 | C-722781 | No |
| 10/1/2022 | Sales Tax for CAM Estimate (10/2022) | 01,02,06 | 772.40 | 0.00 | 11,806.73 | C-722782 | No |
| 10/1/2022 | Base Rent (10/2022) | 01,02,06 | 51,388.47 | 0.00 | 63,195.20 | C-722783 | No |
| 10/1/2022 | Sales Tax for Base Rent (10/2022) | 01,02,06 | 3,597.19 | 0.00 | 66,792.39 | C-722784 | No |
| 10/5/2022 | Chk# :ACH-WEB Online Payment - EFT Payment. Web - Tenant Services | | 0.00 | 66,792.39 | 0.00 | R-299251 | |
| 10/24/2022 | JEA #4473344200 9/8 Electric | | 1,621.11 | 0.00 | 1,621.11 | C-729416 | No |
| 11/1/2022 | CAM Estimate (11/2022) | 01,02,06 | 11,034.33 | 0.00 | 12,655.44 | C-725518 | No |
| 11/1/2022 | Sales Tax for CAM Estimate (11/2022) | 01,02,06 | 772.40 | 0.00 | 13,427.84 | C-725519 | No |
| 11/1/2022 | Base Rent (11/2022) | 01,02,06 | 51,388.47 | 0.00 | 64,816.31 | C-725520 | No |
| 11/1/2022 | Sales Tax for Base Rent (11/2022) | 01,02,06 | 3,597.19 | 0.00 | 68,413.50 | C-725521 | No |
| 11/17/2022 | Chk# :ACH-WEB Online Payment - EFT Payment. Web - Tenant Services | | 0.00 | 68,413.50 | 0.00 | R-302231 | |
| 11/21/2022 | JEA #4473344200 10/11 Electric | | 642.00 | 0.00 | 642.00 | C-734225 | No |
| 11/29/2022 | TI Allowance Rmb 58% Final per Lease Agmt | | -86,028.16 | 0.00 | -85,386.16 | C-734354 | No |
| 11/29/2022 | Amount to be refunded | | 86,028.16 | 0.00 | 642.00 | C-734355 | No |
| 11/29/2022 | Quick refund (Payable) ctr# 518908 | | -86,028.16 | 0.00 | -85,386.16 | P-518908 | |
| 11/30/2022 | Chk# 232867 to payable | | 0.00 | -86,028.16 | 642.00 | K-303723 | |
| 12/1/2022 | CAM Estimate (12/2022) | 01,02,06 | 11,034.33 | 0.00 | 11,676.33 | C-729660 | No |
| 12/1/2022 | Sales Tax for CAM Estimate (12/2022) | 01,02,06 | 772.40 | 0.00 | 12,448.73 | C-729661 | No |
| 12/1/2022 | Base Rent (12/2022) | 01,02,06 | 51,388.47 | 0.00 | 63,837.20 | C-729662 | No |
| 12/1/2022 | Sales Tax for Base Rent (12/2022) | 01,02,06 | 3,597.19 | 0.00 | 67,434.39 | C-729663 | No |
| 12/7/2022 | Chk# :ACH-WEB Online Payment - EFT Payment. Web - Tenant Services | | 0.00 | 67,434.39 | 0.00 | R-304401 | |
| 12/20/2022 | JEA #4473344200 11/9 Electric | | 457.94 | 0.00 | 457.94 | C-739019 | No |
| 1/1/2023 | CAM Estimate (01/2023) | 01,02,06 | 12,518.55 | 0.00 | 12,976.49 | C-736224 | No |
| 1/1/2023 | Sales Tax for CAM Estimate (01/2023) | 01,02,06 | 876.30 | 0.00 | 13,852.79 | C-736225 | No |
| 1/1/2023 | Base Rent (01/2023) | 01,02,06 | 51,388.47 | 0.00 | 65,241.26 | C-736226 | No |
| 1/1/2023 | Sales Tax for Base Rent (01/2023) | 01,02,06 | 3,597.19 | 0.00 | 68,838.45 | C-736227 | No |
| 1/17/2023 | First Coast Elevator #7970 | | 195.00 | 0.00 | 69,033.45 | C-743880 | No |
| 1/20/2023 | ACA ctrl#46338 Ref#25137491 : Automated Cash Application Payment | | 0.00 | 68,838.45 | 195.00 | R-307463 | |
| 1/25/2023 | JEA #4473344200 12/12 Electric | | 538.27 | 0.00 | 733.27 | C-744110 | No |
| 2/1/2023 | CAM Estimate (02/2023) | 01,02,06 | 12,518.55 | 0.00 | 13,251.82 | C-741397 | No |
| 2/1/2023 | Sales Tax for CAM Estimate (02/2023) | 01,02,06 | 876.30 | 0.00 | 14,128.12 | C-741398 | No |
| 2/1/2023 | Base Rent (02/2023) | 01,02,06 | 51,388.47 | 0.00 | 65,516.59 | C-741399 | No |
| 2/1/2023 | Sales Tax for Base Rent (02/2023) | 01,02,06 | 3,597.19 | 0.00 | 69,113.78 | C-741400 | No |

7/28/2023 3:27 PM

**Lease Ledger**

Date: 07/28/2023

Property: deerwd

Tenant: t0002871 FRANKLIN SOUTHERN MANUFACTURING LLC (DIP 4/27/2023)

From Date: 06/01/2022  To Date: 05/31/2027

Move In Date: 06/01/2022

Unit(S): 01, 02, 06

| Date | Description | Unit | Charge | Payment | Balance | Chg/Rec | Hold |
|------|-------------|------|--------|---------|---------|---------|------|
| 2/15/2023 | CAM Reconciliation (06/2022 - 12/2022) | | -1,340.54 | 0.00 | 67,773.24 | C-744994 | No |
| 2/15/2023 | 7.00% Tax applied to Ctrl 744994 | | -93.84 | 0.00 | 67,679.40 | C-744998 | No |
| 2/28/2023 | JEA #4473344200 1/12 Electric | | 820.67 | 0.00 | 68,500.07 | C-751288 | No |
| 3/1/2023 | CAM Estimate (03/2023) | 01,02,06 | 12,518.55 | 0.00 | 81,018.62 | C-748620 | No |
| 3/1/2023 | Sales Tax for CAM Estimate (03/2023) | 01,02,06 | 876.30 | 0.00 | 81,894.92 | C-748621 | No |
| 3/1/2023 | Base Rent (03/2023) | 01,02,06 | 51,388.47 | 0.00 | 133,283.39 | C-748622 | No |
| 3/1/2023 | Sales Tax for Base Rent (03/2023) | 01,02,06 | 3,597.19 | 0.00 | 136,880.58 | C-748623 | No |
| 3/1/2023 | ACA ctrl#48098 Ref#92826785 : Automated Cash Application Payment | | 0.00 | 67,679.40 | 69,201.18 | R-311217 | |
| 3/21/2023 | JEA #4473344200 2/10 Electric | | 587.65 | 0.00 | 69,788.83 | C-755982 | No |
| 3/27/2023 | ACA ctrl#49073 Ref#21591936 : Automated Cash Application Payment | | 0.00 | 21,201.18 | 48,587.65 | R-312975 | |
| 3/27/2023 | ACA ctrl#49074 Ref#21591945 : Automated Cash Application Payment | | 0.00 | 48,000.00 | 587.65 | R-312976 | |
| 4/1/2023 | CAM Estimate (04/2023) | 01,02,06 | 12,518.55 | 0.00 | 13,106.20 | C-752716 | No |
| 4/1/2023 | Sales Tax for CAM Estimate (04/2023) | 01,02,06 | 876.30 | 0.00 | 13,982.50 | C-752717 | No |
| 4/1/2023 | Base Rent (04/2023) | 01,02,06 | 51,388.47 | 0.00 | 65,370.97 | C-752718 | No |
| 4/1/2023 | Sales Tax for Base Rent (04/2023) | 01,02,06 | 3,597.19 | 0.00 | 68,968.16 | C-752719 | No |
| 4/10/2023 | Late fee (04/2023) | | 3,195.35 | 0.00 | 72,163.51 | C-756398 | No |
| 4/17/2023 | JEA #4473344200 3/13 Electric | | 493.13 | 0.00 | 72,656.64 | C-756479 | No |
| 4/18/2023 | Appy Sec Dep to AR Balance per KW | | -41,914.06 | 0.00 | 30,742.58 | C-760867 | No |
| 4/18/2023 | Re-Bill Sec Dep Applied to AR Balance | | 41,914.06 | 0.00 | 72,656.64 | C-760868 | No |
| 4/19/2023 | Chk# :ACH-WEB Online Payment - EFT Payment. Web - Tenant Services | | 0.00 | 72,163.51 | 493.13 | R-315260 | |
| 5/1/2023 | CAM Estimate (05/2023) | 01,02,06 | 12,518.55 | 0.00 | 13,011.68 | C-758748 | No |
| 5/1/2023 | Sales Tax for CAM Estimate (05/2023) | 01,02,06 | 876.30 | 0.00 | 13,887.98 | C-758749 | No |
| 5/1/2023 | Base Rent (05/2023) | 01,02,06 | 51,388.47 | 0.00 | 65,276.45 | C-758750 | No |
| 5/1/2023 | Sales Tax for Base Rent (05/2023) | 01,02,06 | 3,597.19 | 0.00 | 68,873.64 | C-758751 | No |
| 5/1/2023 | First Coast Elevator #8143 | | 195.00 | 0.00 | 69,068.64 | C-761059 | No |
| 5/18/2023 | JEA #4473344200 4/11 Electric | | 375.34 | 0.00 | 69,443.98 | C-765737 | No |
| 5/31/2023 | Chk# :ACH-WEB Online Payment - EFT Payment. Web - Tenant Services Reversed by ctrl# 318797 reversing to post part as ppr | | 0.00 | 69,068.64 | 375.34 | R-318456 | |
| 5/31/2023 | Chk# :ACH-WEB :Prog Gen Reverses receipt Ctrl# 318456 reversing to post part as ppr | | 0.00 | -69,068.64 | 69,443.98 | R-318797 | |
| 5/31/2023 | Chk# ACH WEB 2  Reversed by ctrl# 318799 reversing to split post month | | 0.00 | 69,068.64 | 375.34 | R-318798 | |
| 5/31/2023 | Chk# ACH WEB 2 :Prog Gen Reverses receipt Ctrl# 318798 reversing to split post month | | 0.00 | -69,068.64 | 69,443.98 | R-318799 | |
| 5/31/2023 | Chk# ACH WEB 3  Reversed by ctrl# 322274 NSF, portal pmt never came thru to PNC | | 0.00 | 69,068.64 | 375.34 | R-318801 | |
| 5/31/2023 | Chk# ACH WEB 3 :Prog Gen Reverses receipt Ctrl# 318801 NSF, portal pmt never came thru to PNC | | 0.00 | -69,068.64 | 69,443.98 | R-322274 | |
| 6/1/2023 | CAM Estimate (06/2023) | 01,02,06 | 12,518.55 | 0.00 | 81,962.53 | C-764081 | No |

7/28/2023 3:27 PM

## Lease Ledger

Date: 07/28/2023

Property: deerwd

Tenant: t0002871 FRANKLIN SOUTHERN MANUFACTURING LLC (DIP 4/27/2023)

From Date: 06/01/2022  To Date: 05/31/2027

Move In Date: 06/01/2022

Unit(S): 01, 02, 06

| Date | Description | Unit | Charge | Payment | Balance | Chg/Rec | Hold |
|------|-------------|------|--------|---------|---------|---------|------|
| 6/1/2023 | Sales Tax for CAM Estimate (06/2023) | 01,02,06 | 876.30 | 0.00 | 82,838.83 | C-764082 | No |
| 6/1/2023 | Base Rent (06/2023) | 01,02,06 | 53,469.23 | 0.00 | 136,308.06 | C-764083 | No |
| 6/1/2023 | Sales Tax for Base Rent (06/2023) | 01,02,06 | 3,742.85 | 0.00 | 140,050.91 | C-764084 | No |
| 6/6/2023 | First Coast Elevator #8315 | | 195.00 | 0.00 | 140,245.91 | C-765955 | No |
| 6/27/2023 | JEA #4473344200 5/10 Electric | | 658.97 | 0.00 | 140,904.88 | C-770601 | No |
| 7/1/2023 | CAM Estimate (07/2023) | 01,02,06 | 12,518.55 | 0.00 | 153,423.43 | C-767598 | No |
| 7/1/2023 | Sales Tax for CAM Estimate (07/2023) | 01,02,06 | 876.30 | 0.00 | 154,299.73 | C-767599 | No |
| 7/1/2023 | Base Rent (07/2023) | 01,02,06 | 53,469.23 | 0.00 | 207,768.96 | C-767600 | No |
| 7/1/2023 | Sales Tax for Base Rent (07/2023) | 01,02,06 | 3,742.85 | 0.00 | 211,511.81 | C-767601 | No |
| 7/17/2023 | JEA #4473344200 6/12 Electric | | 628.70 | 0.00 | 212,140.51 | C-775298 | No |
| 7/18/2023 | First Coast Elevator #8433 | | 495.00 | 0.00 | 212,635.51 | C-775315 | No |
| 8/1/2023 | CAM Estimate (08/2023) | 01,02,06 | 12,518.55 | 0.00 | 225,154.06 | C-771070 | No |
| 8/1/2023 | Sales Tax for CAM Estimate (08/2023) | 01,02,06 | 876.30 | 0.00 | 226,030.36 | C-771071 | No |
| 8/1/2023 | Base Rent (08/2023) | 01,02,06 | 53,469.23 | 0.00 | 279,499.59 | C-771072 | No |
| 8/1/2023 | Sales Tax for Base Rent (08/2023) | 01,02,06 | 3,742.85 | 0.00 | 283,242.44 | C-771073 | No |